IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
November 12, 2025 Session

**MARY SUE GASTON LEE v. DANNY C. LEE**

**Appeal from the Chancery Court for McMinn County**
**No. 2018-CV-294          Jerri S. Bryant, Chancellor**

_____

**No. E2024-01696-COA-R3-CV**

_____

In this divorce matter, the trial court classified and valued the parties' assets, subsequently fashioning a distribution of the marital assets and liabilities that the court deemed equitable. The husband has appealed. We reverse the trial court's determination regarding the classification and valuation of two assets and remand those issues to the trial court for further determination. Accordingly, because of these unresolved classification and valuation issues, we vacate the trial court's overall distribution of marital property and remand that issue for further determination as well.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed in Part, Reversed in Part, Vacated in Part; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which JOHN W. MCCLARTY, P.J., E.S., and KRISTI M. DAVIS, J., joined.

Melanie Lane Dimond, Jamestown, Tennessee, for the appellant, Danny C. Lee.

M. Randall Sellers, Cleveland, Tennessee, for the appellee, Mary Sue Gaston Lee.

**OPINION**

I. Factual and Procedural History

On August 30, 2018, Mary Sue Gaston Lee ("Wife") filed a divorce complaint in the McMinn County Chancery Court ("trial court") against Danny C. Lee ("Husband"). In the complaint, Wife averred that grounds for divorce existed based on the parties' irreconcilable differences. Alternatively, Wife averred that Husband had engaged in inappropriate marital conduct. The parties had been married since August 1996, and no children were born of the marriage. Wife asked the trial court to equitably divide the

parties' marital assets and liabilities and award to her a parcel of improved real property located on County Road 850 in Etowah, Tennessee ("the Etowah House") as her separate property. Citing the statutory injunction automatically applicable to divorce actions, *see* Tenn. Code Ann. § 36-4-106(d), Wife sought relief from the court regarding Husband's alleged actions of "hiding" rental payments from their properties and changing the beneficiary of his life insurance.

On September 13, 2018, the trial court entered an "Agreed Order to Consolidate," which consolidated the divorce action filed by Wife with a separate divorce complaint filed by Husband in the trial court on August 31, 2018. In this order, the parties agreed and the court acknowledged that Husband's complaint would be treated as a counter-complaint.

The record demonstrates that the parties owned several businesses and parcels of real property and that they also had substantial amounts of debt, both personal and related to their businesses. A significant issue in the division of the marital estate concerned Husband's actions relative to one of their businesses, Precision Technologies, Incorporated ("PTI"), during the parties' separation. PTI is a machine tool distributor business that represents machine makers who produce equipment typically used in manufacturing. PTI utilizes salespeople and operates on a commission basis with PTI normally receiving three to five percent of the cost of the machines sold. Both parties worked at PTI during the marriage, and Husband maintained control of the business during the pendency of the divorce.

On December 12, 2018, the trial court entered an order regarding pending motions filed by Wife and found that "[t]here does not appear to be a lot of cash to go around." The court ordered that (1) Wife be given "complete access to all financial accounts of the parties," (2) "all checks for payment of expenses and businesswise shall be signed by both parties," (3) funds in the "rental account" were to be used to pay the first and second mortgages with such payments to be made on time, (4) PTI was "not to be kept afloat by the parties' personal account," (5) the parties should pick one parcel of non-income-producing property to be sold to provide funds for the parties' attorney's fees and other expenses, (6) expenses related to the farm were not to be paid from the rental account unless the parties mutually agreed to do so, (7) Husband was to reimburse the rental account for funds he withdrew in the amount of $300.00, and (8) Wife would be reimbursed $300.00 per month from the rental account for her payment of Husband's health insurance premiums.[1] On February 15, 2019, Wife filed a motion requesting that the court "revisit" the *pendente lite* attorney's fee issue because no properties had been sold. Following a hearing, the court entered an order on August 12, 2019, ordering that certain marital real properties be sold.

---

[1] This same order appears to have been entered again on February 5, 2019.

During the following months, Wife filed motions asking the trial court to order that various parcels of marital property be sold to provide funds to pay the parties' expenses. She also filed a motion requesting that the court hold Husband in contempt for his failure to comply with the court's previous orders. Husband likewise filed a motion for contempt against Wife. On December 23, 2019, the trial court entered an order directing that Wife would be allowed to collect all rents and pay expenses with regard to the parties' rental properties. On August 14, 2020, the court ordered that certain marital real properties be relisted for sale with the parties' realtor and that the parties follow the realtor's recommendations.

In a motion to recuse filed on September 11, 2020, Husband averred that the chancellor's spouse and Husband's accountant were both partners at WarrenJackson Certified Public Accountants, PLLC, in McMinn County and that WarrenJackson had prepared tax returns for the parties or their various businesses for three years. As such, Husband alleged that this could create an "appearance of impropriety." The motion states in its entirety:

> Now comes Defendant, Danny C. Lee, by and through Attorney, Robert N. Meeks, and pursuant to *Rule 7 of the Tenn. Rules of Civil Procedure* and *Local Rule 6*, and respectfully moves this Honorable Court to recuse itself from hearing this case. For cause, Defendant would show that the Court's spouse and the Defendant's CPA are both partners of WarrenJackson Certified Public Accountants, PLLC in McMinn County; that firm has prepared tax returns for the parties hereto under various enterprises for three (3) years. Wherefore, in order to avoid the appearance of impropriety, Defendant respectfully requests the Court recuse itself from hearing this case. So moved.

Husband did not support the motion with an affidavit or any other materials, and he did not affirmatively state that the motion was not being presented for any improper purpose. *See* Tenn. R. Sup. Ct. 10B, § 1.01.

The transcript of a hearing conducted on September 11, 2020, reveals that the motion to recuse was filed twenty minutes before the motion hearing and that the trial court judge was unaware of its filing before Husband's counsel brought it to her attention. The trial court asked Husband's counsel whether anyone from the accounting firm would be called to testify in the case, and Husband's counsel responded that there was no such witness at that time. The trial court stated that because no one from the firm would be called to testify, no basis for recusal existed. At the same hearing, the trial court heard and

granted Wife's motion regarding a sale of real property. The trial court did not immediately enter a written order denying the motion to recuse.[2]

On September 22, 2020, the trial court entered an order from the hearing that it had conducted on September 11, 2020, wherein the trial court approved the sale of a parcel of real property for $25,000.00 but did not address the recusal motion. During the ensuing months, the parties filed numerous motions concerning discovery, mediation, contempt, and other issues.

On September 9, 2021, the trial court entered an order directing that a parcel of marital real property be sold to provide funds for an appraisal of the parties' farm property, PTI, and other parcels of real property and businesses. The court further ordered that each party would be awarded $25,000.00 for attorney's fees from the proceeds. A few days later, Husband filed two motions for permission to file an interlocutory appeal, both of which were apparently denied by the trial court (although no order appears in the record). Meanwhile, the parties continued to file numerous motions related to discovery, appraisals and sales of property, continuances, and alleged contempt of court. The court entered orders directing the sale of various properties and specifying how the proceeds should be used. The court was frequently forced to reiterate its earlier orders due to Husband's noncompliance.

The trial court conducted a pretrial hearing in August 2022, during which a witness from WarrenJackson was called to testify. At the point that the witness was called, the trial court interrupted and immediately informed the parties that the witness worked with her husband. The court inquired: "Are you all waiving any possible complaints about that, both of you?" Both parties' counsel indicated their waiver of the issue, and the trial court proceeded with the hearing.

The trial in this matter spanned several days: February 14-15, 2023; March 9 and 17, 2023; and May 22, 2023. Witnesses included the parties, real estate appraisers, accountants, Husband's paramour, Husband's former bookkeeper, and two of Husband's business associates.

In its resultant order dated August 31, 2023, the trial court found that the operation and valuation of PTI was the "most contentious area of disagreement between the parties." The court found that Husband had used "shareholder loans" as a "mechanism to get money out of the company to avoid taxes" and that Husband had acknowledged that he had back-dated promissory notes and engaged in other practices that would devalue the company. Moreover, Husband, in violation of the statutory injunction, had taken out a business loan in the amount of roughly $433,000.00 during the COVID-19 pandemic. The court found

---

[2] The record demonstrates that an order denying the motion to recuse was prepared by Husband's then-counsel and approved by Wife's counsel, but the order was never signed by the trial court judge.

that if this loan were repaid to PTI in addition to the shareholder loans, PTI's value would increase significantly. Concerning the shareholder loan, the trial court found that "Husband has no intention of repaying the $600,000 he has taken from the company."

The trial court further determined that Husband had engaged in a myriad of actions that had dissipated marital assets, many of which pertained to PTI, and that he had attempted to hide assets from Wife and the court in violation of both the statutory injunction and multiple court orders. These actions included, but were not limited to, taking money from PTI and moving it to an account in Alabama; failing to include numerous assets on his master asset list; obtaining the $433,000.00 business loan; denying Wife access to PTI's bank accounts; withdrawing funds from an account in advance of writing a court-ordered check to Wife so that the check would bounce; allowing beef from the couples' dairy farm to spoil; failing to sell all of his cattle when ordered to do so by the trial court; deliberately devaluing one of the couple's homes by failing to maintain it; and instructing PTI's bookkeeper to back-date documents, conceal information from Wife, and hide the parties' collection of guns. By reason of these actions, the trial court found that Husband was not a credible witness and held him in contempt of court.[3] The court determined that to protect Wife from "Husband's possible fraudulent activity and the hiding of various assets," certain marital assets would need to be sold.

The trial court found that PTI had been worth $400,000.00 "before Husband's actions dissipated it in an effort to deprive Wife of her lawful share." Although at the time of the divorce hearing, the parties agreed that the company was essentially worthless, the trial court determined that PTI was due to receive a $165,000.00 commission from the sale of a machine.[4] Because the sale was already completed, the court determined that Husband was delaying payment, presumably in an effort to shield those funds from the divorce proceedings. Moreover, the court determined that Husband had devalued the company by acquiring additional debt during the parties' separation and by utilizing shareholder loans to withdraw funds from PTI without incurring income tax liability. The court ultimately valued PTI at $565,000.00 and awarded it to Husband.

The trial court determined the Etowah House to be Wife's separate property. In finding that the home was not marital property, the trial court considered that (1) Wife was residing there at the time of the marriage, (2) the couple only lived there for two months during the marriage while their other home was undergoing repairs, (3) Husband's name was never on the deed to the real property, and (4) Wife had paid off the mortgage during the parties' separation. The court awarded this property to Wife at a value of $275,000.00.

---

[3] The trial court noted in its order that "in twenty-five (25) years it has presided over divorce cases, it has never seen an individual attempt to hide assets, be untruthful regarding assets, and continue to move assets, in violation of the statutory injunction, as much as [Husband]."

[4] This commission does not appear to have been included in PTI's appraisals.

- 5 -

The trial court found that together, the parties owed more than $1,300,000.00 in marital debt. The court also found that the marital estate maintained a gross value of $2,164,913.00. As such, the court ordered much of the marital debt to be paid from the proceeds of sales of various parcels of marital real property.

Following the trial, the trial court awarded to Wife $68,911.25 in attorney's fees. Husband filed a motion for an interlocutory appeal on December 5, 2023. The trial court denied the motion by order dated January 4, 2024. Husband then pursued a Tennessee Rule of Appellate Procedure 10 extraordinary appeal in this Court, which was likewise denied.

The trial court approved the sale of the parties' farm at auction by order dated February 7, 2024, for $802,000.00. On April 18, 2024, Takisawa Tech Corp. ("Takisawa") filed a notice of judgment lien and motion to intervene. Takisawa stated that it had obtained a judgment against PTI, which had been recorded in the McMinn County Register's Office. The trial court granted Takisawa's motion to intervene on June 17, 2024.

On July 30, 2024, the trial court entered an order concerning the parties' final property division. The court discerned that because the properties that "entangled" the parties' real properties and PTI had been sold, the court was "now able to make its final distribution of the marital estate." The court found that the parties' total marital assets were worth $2,143,559.00. The court noted that after selling certain properties and paying off several debts, $339,350.00 remained from the sale of the parties' properties. The court divided those remaining funds between the parties. The court also attached a spreadsheet outlining its division of marital assets and liabilities.

Husband filed a motion to alter or amend, motion to set aside, and motion to stay and for other relief on August 21, 2024. Wife filed a motion to clarify or, in the alternative, a motion to alter or amend. Both parties reported that the clerk and master currently held funds in excess of $500,000.00 from sales of the parties' properties, an amount significantly greater than that recited in the trial court's July 2024 order. Wife also asserted that the trial court should have deducted from the total and awarded solely to her (1) the original amount that the court had ordered would be paid to her to equalize the parties' estates, (2) the combined amount of debts that Husband had been ordered to pay that were instead paid from the proceeds of the marital properties, and (3) a lien for the value of items of personalty awarded to Wife that Husband had not given her.

On October 22, 2024, the trial court entered an order acknowledging that the court clerk held over $561,000.00 in trust for the parties rather than $339,350.00. The court therefore amended its earlier order to include this amount of funds and to adjust the value of the total marital estate. The court then distributed the marital estate in a manner it deemed equitable based on the revised total.

Concerning Husband's motion to stay, the trial court again noted its findings with respect to Husband's propensity to hide, devalue, and dispose of assets during the pendency of the divorce proceedings. The court also found that placing properties in Wife's name would "put them out of reach of Husband's creditors, real or made up." Accordingly, the court denied Husband's motion for a stay pending appeal. On November 13, 2024, Husband filed a notice of appeal.

After his notice of appeal was filed and the trial court transmitted the record to this Court, Husband filed a motion to supplement the record, asserting that the transcript from the September 2020 hearing should have been included because a motion to recuse had been filed but no order addressing the motion appeared in the record. This Court promptly entered an order remanding the motion to the trial court for disposition. A supplemental record was later filed with this Court, revealing that during the remand, Husband's counsel had filed an amended motion to recuse on June 17, 2025, which was virtually identical to the first motion to recuse. This motion also failed to comply with the requirements of Tennessee Supreme Court Rule 10B, § 1.01. The trial court entered an order denying the amended motion on July 10, 2025, reasoning that the two recusal motions were essentially the same and that both had failed to comply with the requirements of Tennessee Supreme Court Rule 10(b). Moreover, the trial court stated that in his first motion, Husband had only alleged that the WarrenJackson witness "might" testify, but the witness had not actually been called until August 2022, over two years later. The court recounted that the issue was raised during the August 2022 hearing and that the parties had waived any potential problem with the trial court judge's presiding over the matter. In its July 2025 order, the trial court stated that because Husband had waived the issue, both the original motion and the amended motion were "again" denied. The trial court also denied the latter motion as untimely.

## II. Issues Presented

Husband presents the following issues for our review, which we have restated and reordered slightly:

1. Whether the trial court erred in failing to dispose of the initial motion to recuse prior to proceeding further in the case.

2. Whether the trial court erred in determining the Etowah House to be Wife's separate property.

3. Whether the trial court erred in determining that the parties' business, PTI, was worth $565,000.00.

4. Whether the trial court's division of the marital estate was inequitable.

## III. Standard of Review

We review a trial court's factual findings in a non-jury case *de novo* upon the record with a presumption of correctness as to the findings of fact unless the preponderance of the evidence is otherwise. *See* Tenn. R. App. P. 13(d); *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000). We review questions of law *de novo* with no presumption of correctness. *Bowden*, 27 S.W.3d at 916 (citing *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 924 (Tenn. 1998)). To the extent that the trial court's determinations rest upon an assessment of the credibility of witnesses, the determinations will not be overturned absent clear and convincing evidence to the contrary. *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

This Court reviews the denial of a motion for recusal under a *de novo* standard of review. Tenn. Sup. Ct. R. 10B, § 2.01. As our Supreme Court has explained:

> "[T]he test for recusal is an objective one because the appearance of bias is just as injurious to the integrity of the courts as actual bias." State v. Cannon, 254 S.W.3d 287, 307 (Tenn. 2008) (citing Davis v. Liberty Mut. Ins. Co., 38 S.W.3d 560, 564 (Tenn. 2001)). Thus, the test for recusal requires a judge to disqualify himself or herself in any proceeding in which "a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality." Id. (quoting Davis at 564); see also Clinard v. Blackwood, 46 S.W.3d 177, 187 (Tenn. 2001) ("[B]ecause judges have a privileged understanding of the legal system, they may fail to find an appearance of impropriety where one would be found by a layperson.").

*State v. Griffin*, 610 S.W.3d 752, 758 (Tenn. 2020).

With respect to a trial court's valuation of marital assets, this Court has explained:

> The valuation of a marital asset is a question of fact. It is determined by considering all relevant evidence, and each party bears the burden of bringing forth competent evidence. *See Wallace v. Wallace*, 733 S.W.2d 102, 107 (Tenn. Ct. App. 1987). If the evidence of value is conflicting, the trial judge may assign a value that is within the range of values supported by the evidence. *See Ray v. Ray*, 916 S.W.2d 469, 470 (Tenn. Ct. App. 1995); *Wallace v. Wallace*, 733 S.W.2d at 107. On appeal, we presume the trial judge's factual determinations are correct unless the evidence preponderates against them. *See Jahn v. Jahn*, 932 S.W.2d 939, 941 (Tenn. Ct. App. 1996).

*Kinard v. Kinard*, 986 S.W.2d 220, 231 (Tenn. Ct. App. 1998).

In a case involving the proper classification and distribution of assets incident to a divorce, our Supreme Court has clarified the applicable standard of appellate review as follows:

> This Court gives great weight to the decisions of the trial court in dividing marital assets and "we are disinclined to disturb the trial court's decision unless the distribution lacks proper evidentiary support or results in some error of law or misapplication of statutory requirements and procedures." *Herrera v. Herrera*, 944 S.W.2d 379, 389 (Tenn. Ct. App. 1996). As such, when dealing with the trial court's findings of fact, we review the record de novo with a presumption of correctness, and we must honor those findings unless there is evidence which preponderates to the contrary. Tenn. R. App. P. 13(d); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). Because trial courts are in a far better position than this Court to observe the demeanor of the witnesses, the weight, faith, and credit to be given witnesses' testimony lies in the first instance with the trial court. *Roberts v. Roberts*, 827 S.W.2d 788, 795 (Tenn. Ct. App. 1991). Consequently, where issues of credibility and weight of testimony are involved, this Court will accord considerable deference to the trial court's factual findings. *In re M.L.P.*, 228 S.W.3d 139, 143 (Tenn. Ct. App. 2007) (citing *Seals v. England/Corsair Upholstery Mfg. Co.*, 984 S.W.2d 912, 915 (Tenn. 1999)). The trial court's conclusions of law, however, are accorded no presumption of correctness. *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 744-45 (Tenn. 2002).

*Keyt v. Keyt*, 244 S.W.3d 321, 327 (Tenn. 2007). Questions relating to the classification of assets as marital or separate are questions of fact. *Bilyeu v. Bilyeu*, 196 S.W.3d 131, 135 (Tenn. Ct. App. 2005).

Furthermore, as this Court has previously held:

> Because Tennessee is a "dual property" state, a trial court must identify all of the assets possessed by the divorcing parties as either separate property or marital property before equitably dividing the marital estate. Separate property is not subject to division. In contrast, Tenn. Code Ann. § 36-4-121(c) outlines the relevant factors that a court must consider when equitably dividing the marital property without regard to fault on the part of either party. An equitable division of marital property is not necessarily an equal division, and § 36-4-121(a)(1) only requires an *equitable* division.

*McHugh v. McHugh*, No. E2009-01391-COA-R3-CV, 2010 WL 1526140, at *3-4 (Tenn. Ct. App. Apr. 16, 2010) (internal citations omitted). *See Manis v. Manis*, 49 S.W.3d 295,

306 (Tenn. Ct. App. 2001) (holding that appellate courts reviewing a distribution of marital property "ordinarily defer to the trial judge's decision unless it is inconsistent with the factors in Tenn. Code Ann. § 36-4-121(c) or is not supported by a preponderance of the evidence.").

## IV. Recusal

Husband argues that the trial court erred by failing to rule upon his motion to recuse, filed on September 11, 2020, before issuing further rulings in this case. *See* Tenn. R. Sup. Ct. 10B, § 1.02. Husband asserts that although the recusal motion was discussed during a Zoom hearing conducted on the same day the motion was filed, the trial court had "declined" to rule on it at that time due to inadequate notice. Husband claims that the trial court never actually ruled upon the motion until July 10, 2025.

A review of the record in this action belies Husband's assertions to some degree. Although Husband did file a motion to recuse on September 11, 2020, the transcript from a previously scheduled hearing conducted on that same date reveals that the motion to recuse was filed just prior to the hearing and that the chancellor was unaware of its filing until Husband's counsel mentioned it. The chancellor then asked Husband's counsel whether anyone from the accounting firm would be called to testify in the case, and Husband's counsel responded, "not that I know of, although . . . there might have to be a CPA involved." The trial court stated that because no one from the firm would be called to testify, no basis for recusal existed at that time. The court also subsequently articulated: "I can't really rule on a motion that you hand me three seconds . . . after it's been filed if it's not the one that's up for today."

Husband is correct that the trial court did not enter a written order denying the motion to recuse at that time. However, the supplemental record contains a draft of an order denying the motion to recuse, which appears to have been prepared by Husband's then-counsel on October 1, 2020, and approved by Wife's counsel on October 5, 2020. The draft order states: "After hearing argument on the Motion, the Court denied the Motion without prejudice such that the Defendant may re-file should the circumstances change surrounding the potential witness referenced in Defendant's Motion to Recuse" (emphasis added). Inexplicably, the order was never signed by the chancellor, and there is no proof demonstrating that the order had ever been transmitted to the court. Husband's then-counsel withdrew from the case shortly thereafter.

The draft order, which recites that the trial court had denied the motion to recuse at the September 2020 hearing and which was approved for filing by both Husband's and Wife's counsel, demonstrates that both parties' counsel understood from the trial court's statements made during the hearing that the court had denied the motion from the bench. Accordingly, Husband's assertion that the trial court had simply "declined" to rule on the motion is unavailing.

- 10 -

In support of his assertion that the trial court erred by failing to immediately enter a written order, Husband relies on the provisions of Tennessee Supreme Court Rule 10B, which state in pertinent part:

> 1.02. While the motion [to recuse] is pending, the judge whose disqualification is sought shall make no further orders and take no further action on the case, except for good cause stated in the order in which such action is taken.

> 1.03. Upon the filing of a motion pursuant to section 1.01, the judge shall act promptly by written order and either grant or deny the motion. If the motion is denied, the judge shall state in writing the grounds upon which he or she denies the motion. Notwithstanding the foregoing, if a subsequent section 1.01 motion is filed in the same case but fails to state, with specificity, substantially different factual and legal grounds than those relied upon in support of a previous section 1.01 motion, the judge may act summarily by filing a written order denying the motion as repetitive. The judge need not require a response to the motion, conduct a hearing on it, or provide any other written explanation for denying the motion.

Husband contends that the trial court erred by failing to immediately enter a written order regarding the recusal motion that met the requirements of the above provisions. In support, Husband relies on *State v. Coleman*, No. M2017-00264-CCA-R3-CD, 2018 WL 1684365, at *9 (Tenn. Crim. App. Apr. 6, 2018), wherein the Court of Criminal Appeals held that "[w]hen a trial court ignores a pending motion to recuse and enters further orders in a case without making a finding of good cause as dictated by Rule 10B section 1.02, the orders entered during the pendency of the motion to recuse may be vacated on appeal" (internal citations omitted).

We acknowledge that numerous opinions from both this Court and the Court of Criminal Appeals support Husband's assertion on this point. *See Tepe v. Blair*, No. E2025-02002-COA-T10B-CV, 2026 WL 92299, at *5 (Tenn. Ct. App. Jan. 13, 2026) (vacating the trial court's interim orders regarding substantive issues that were entered during the period after the recusal motion had been filed but before it had been adjudicated); *Matter of Conservatorship of Tapp*, No. W2021-00718-COA-R3-CV, 2023 WL 1957540, at *3-4 (Tenn. Ct. App. Feb. 13, 2023) (vacating the trial court's dismissal order that was entered before a written order regarding recusal even though the court had orally denied the recusal motion); *Adams v. Dunavant*, No. W2022-01747-COA-T10B-CV, 2023 WL 1769356, at *4 (Tenn. Ct. App. Feb. 3, 2023) (vacating the trial court's orders regarding substantive issues that were entered after the recusal motion was filed because the recusal motion had not been adjudicated by the trial court); *Clay Cnty. v. Purdue Pharma L.P.*, No. E2022-

- 11 -

00349-COA-T10B-CV, 2022 WL 1161056, at *4 (Tenn. Ct. App. Apr. 20, 2022) (vacating an order assessing sanctions that was incorporated into the written order adjudicating a recusal motion); *Rodgers v. Sallee*, No. E2013-02067-COA-R3-CV, 2015 WL 636740, at *5 (Tenn. Ct. App. Feb. 13, 2015) (vacating two orders entered after recusal motion was filed but before recusal motion was adjudicated). *See also Tucker v. State*, No. M2018-01196-CCA-R3-ECN, 2019 WL 3782166, at *2 (Tenn. Crim. App. Aug. 12, 2019) (vacating order entered after recusal motion was filed but before recusal was adjudicated); *Coleman*, 2018 WL 1684365, at *9 ("When a trial court ignores a pending motion to recuse and enters further orders in a case without making a finding of good cause as dictated by Rule 10B section 1.02, the orders entered during the pendency of the motion to recuse may be vacated on appeal."). *But see In re Conservatorship of Tate*, No. M2012-01918-COA-10B-CV, 2012 WL 4086159, at *3 (Tenn. Ct. App. Sept. 17, 2012) (declining to require vacatur of a substantive ruling after the filing of a motion to recuse when the trial court heard the motion to recuse and substantive motion on the same date and issued oral rulings as to both but subsequently entered a written order on the substantive issue before entering a written order adjudicating the recusal motion).

Wife relies upon *Hastings v. Hastings*, No. W2020-01225-COA-R3-JV, 2024 WL 1480373, at *7 (Tenn. Ct. App. Apr. 5, 2024), *perm. app. denied* (Tenn. Aug. 14, 2024), as standing for the proposition that when a trial court makes an oral ruling regarding a recusal motion from the bench but fails to immediately enter a written order, such action can constitute harmless error. In *Hastings*, the litigant had filed a recusal motion on November 27, 2019, and the trial court had denied the motion by oral ruling from the bench on January 3, 2020. *See id.* However, the trial court did not enter a written order regarding the recusal motion until July 16, 2020. *Id.* Meanwhile, the trial court had ruled on other substantive matters. *Id.*

On appeal, the *Hastings* movant argued that the trial court judge had erred by "continuing to make decisions in this case pending a written order on her recusal motion." *Id.* at *6. The *Hastings* Court stated:

> Tennessee Supreme Court Rule 10B, Section 1.02, provides that, while a recusal motion is pending, "the judge whose disqualification is sought shall make no further orders and take no further action on the case, except for good cause stated in the order in which such action is taken." Tenn. Sup. Ct. R. 10B, § 1.02. This provision "requires the trial court to first analyze the motion to disqualify before proceeding to any substantive issues in the case." *In re Destiny C.*, No. M2021-00533-COA-R3-PT, 2022 WL 2287022, at *10 (Tenn. Ct. App. June 24, 2022) (citation omitted).
>
> Thus, "[w]hen a trial court ignores a pending motion to recuse and enters further orders in a case without making a finding of good cause as dictated by Rule 10B section 1.02, the orders entered during the pendency of

- 12 -

the motion to recuse may be vacated on appeal." *State v. Coleman*, No. M2017-00264-CCA-R3-CD, 2018 WL 1684365, at *9 (Tenn. Crim. App. Apr. 6, 2018) (citations omitted). Nevertheless, this court "has declined to vacate an order entered during the pendency of a motion to recuse when the trial judge had orally denied the motion to recuse prior to entering the written order on the substantive issues." *Id.* (citation omitted).

Here, [the trial court judge] denied Mother's recusal motion from the bench during the January 3, 2020 hearing. Thus, [the trial court judge] denied the recusal motion before she heard and decided the matters addressed in her June 26, 2020 order. Although "[t]he better practice would have been to enter the order denying the motion for recusal before entering the order[s] on [the other matters]," *In re Conservatorship of Tate*, No. M2012-01918-COA-10B-CV, 2012 WL 4086159, at *3 (Tenn. Ct. App. Sept. 17, 2012), we find this error by [the trial court judge] to be harmless. *See Coleman*, 2018 WL 1684365, at *9.

*Id.* at *7. The Court ultimately found no reversible error when the trial court had heard and ruled on other matters after orally denying the recusal motion but before entering the written order denying the recusal motion. *Id.*

Similarly, in the case at bar, the trial court denied the motion to recuse during the September 2020 hearing via oral ruling and stated the reason for its denial, but the court failed to immediately enter a written order memorializing that ruling. We acknowledge, however, that the delay between the trial court's oral ruling on the motion and its entry of a written order herein was significantly longer than the delay in *Hastings* and that the court rendered many substantive rulings during that timeframe.

There is, however, another important factor we must consider when analyzing the weight of the trial court's delay in entering a written order regarding recusal. The court herein conducted a pretrial hearing in August 2022, during which a witness from WarrenJackson was called to testify. At that point, the chancellor stopped the hearing and *sua sponte* raised the issue, informing the parties that the witness worked with her spouse. The court then asked both counsel: "Are you all waiving any possible complaints about that, both of you?" Husband's counsel responded, "Yes." Wife's counsel responded: "Absolutely. We're waiving any possible conflict or anything from that." In its July 2025 order, the trial court relied on this waiver as an additional basis for denying the motion to recuse.

This basis has merit, in that this Court has previously held that a recusal issue was waived when the movants announced at the beginning of trial that they had "no problem" with the trial court judge presiding over the case when he disclosed that he had attended college with the plaintiffs. *See Corrado v. Hickman*, 113 S.W.3d 319, 325 (Tenn. Ct. App.

- 13 -

2003). *See also Collier v. Griffith*, No. 01-A-019109-CV-00339, 1992 WL 44893, at *5 (Tenn. Ct. App. Mar. 11, 1992) (finding that the right to seek recusal was waived when the trial court judge made a disclosure of prior involvements with the opposing party at the beginning of the hearing and the party seeking recusal did not object at that time). Although these cases predated the enactment of Rule 10B, they nonetheless demonstrate that parties may waive a recusal issue by expressly stipulating to such waiver during a hearing.

In addition, other circumstances regarding waiver are noteworthy: (1) Husband has not presented any evidence that he ever set the recusal motion for hearing following the trial court's September 2020 oral ruling and (2) Husband only raised the issue following five additional years of litigation, a lengthy trial, post-trial matters, an ultimate disposition that he apparently disliked, and his filing of an appeal with this Court. As this Court has often stated:

> A party may lose the right to challenge a judge's impartiality by engaging in strategic conduct. Courts frown upon the manipulation of the impartiality issue to gain procedural advantage and will not permit litigants to refrain from asserting known grounds for disqualification in order "to experiment with the court . . . and raise the objection later when the result of the trial is unfavorable." *Holmes v. Eason*, 76 Tenn. (8 Lea) 754, 757 (1882); *see also Gotwald v. Gotwald*, 768 S.W.2d 689, 694 (Tenn. Ct. App. 1988). Thus, recusal motions must be filed promptly after the facts forming the basis for the motion become known, *see United States v. Baker*, 441 F. Supp. 612, 616 (M.D. Tenn. 1977); *Hunnicutt v. Hunnicutt*, 248 Ga. 516, 283 S.E.2d 891, 893 (1981), and the failure to assert them in a timely manner results in a waiver of a party's right to question a judge's impartiality. *See In re Cameron*, 126 Tenn. [614,] 663, 151 S.W. [64,] 78 [(1912)]; *Radford Trust Co. v. East Tennessee Lumber Co.*, 92 Tenn. 126, 136-37, 21 S.W. 329, 331 (1893); *Holmes v. Eason*, 76 Tenn. (8 Lea) at 761.

*Kinard*, 986 S.W.2d at 228. *See also Dougherty v. Dougherty*, No. W2021-01014-COA-T10B-CV, 2021 WL 4449649, at *3 (Tenn. Ct. App. Sept. 29, 2021) ("A motion to recuse should never be used by litigants to delay proceedings or to gain some procedural advantage in a case. Indeed, our courts frown upon such gamesmanship as it undermines the purpose of our recusal rules.") (internal citations omitted). Here, although the trial court's failure to enter a written order in a timely fashion was not the best practice, *see In re Conservatorship of Tate*, 2012 WL 4086159, at *3, we find this error to be harmless given the circumstances of the instant action. Husband should not be allowed to take advantage of an error that he easily could have brought to the trial court's attention before the litigation was concluded, especially when he had expressly waived the issue during a pretrial hearing.

Upon review, we further note that Husband's recusal motions did not comply with Rule 10B's requirements, as the trial court ultimately found. Neither motion affirmatively stated that the motion had not been presented for an improper purpose, and neither motion was supported by an affidavit. *See* Tenn. R. Sup. Ct. 10B, § 1.01. As this Court has explained:

> [A Rule 10B] motion for recusal "shall be supported by an affidavit under oath or a declaration under penalty of perjury by personal knowledge or by other appropriate materials[.]" Tenn. Sup. Ct. R. 10B, § 1.01. We have repeatedly held that this language is mandatory. *See, e.g.*, *Elliott v. Elliott*, No. E2012-02448-COA-10B-CV, 2012 WL 5990268 (Tenn. Ct. App. Nov. 30, 2012). When a petitioner fails to support a motion with this mandatory affidavit or declaration under penalty of perjury, we have repeatedly held that the request for recusal was waived. *See, e.g.*, *Hobbs Purnell Oil Company, Inc. v. Butler*, No. M2016-00289-COA-R3-CV, 2017 WL 121537, at *14-15 (Tenn. Ct. App. Jan. 12, 2017); *Childress v. United Postal Serv., Inc.*, No. W2016-00688-COA-T10B-CV, 2016 WL 3226316, at *2-3 (Tenn. Ct. App. June 3, 2016); *Johnston v. Johnston*, No. E2015-00213-COA-T10B-CV, 2015 WL 739606, at *2 (Tenn. Ct. App. Feb. 20, 2015).

*Moncier v. Wheeler*, No. E2020-00943-COA-T10B-CV, 2020 WL 4343336, at *3 (Tenn. Ct. App. July 28, 2020). *See State v. Loredo*, No. W2023-00088-CCA-R3-CD, 2024 WL 912486, at *7 (Tenn. Crim. App. Mar. 4, 2024) ("The affirmative statement [of no improper purpose] was mandatory under Tennessee Supreme Court Rule 10B, and a defective motion can result in waiver of the recusal issue."); *In re Conservatorship of Osborn*, No. M2020-01447-COA-R3-CV, 2021 WL 5144547, at *9 (Tenn. Ct. App. Nov. 5, 2021) (affidavit required by Rule 10B is mandatory); *Hobbs Purnell Oil Co. v. Butler*, No. M2016-00289-COA-R3-CV, 2017 WL 121537, at *14-15 (Tenn. Ct. App. Jan. 12, 2017) (finding that the movants' failure to affirmatively state the lack of an improper purpose or file an affidavit as required by Rule 10B, § 1.01, resulted in waiver of the recusal issue).

Based on the unique circumstances presented in this case, we conclude that Husband has waived any issue regarding his initial recusal motion. We further conclude that Husband's subsequent recusal motion was timely denied by the trial court and that the record supports that denial due to Husband's failure to comply with the requirements of Rule 10B. Accordingly, we affirm the trial court's denial of the recusal motion.

## V. The Etowah House

Husband argues that the trial court erred by classifying the Etowah House as Wife's separate property. In support, Husband asserts that because marital funds were used to pay the mortgage, improve the home, and increase its value, the trial court erred by awarding the Etowah House to Wife as her separate property. Husband further posits that any

increase in value in the Etowah House during the marriage should have been classified and distributed as a marital asset. Wife contends that the trial court properly found the Etowah House to be her separate property because she owned it prior to the marriage and Husband's name never appeared on the deed.

Concerning this issue, Tennessee Code Annotated § 36-4-121(b)(1)(A) (West, July 1, 2017, to current) provides in pertinent part:

> "Marital property" means all real and personal property, both tangible and intangible, acquired by either or both spouses during the course of the marriage up to the date of the final divorce hearing and owned by either or both spouses as of the date of filing of a complaint for divorce, except in the case of fraudulent conveyance in anticipation of filing, and including any property to which a right was acquired up to the date of the final divorce hearing, and valued as of a date as near as reasonably possible to the final divorce hearing date.

Additionally, Tennessee Code Annotated § 36-4-121(b)(1)(B)(i) provides that marital property includes "income from, and any increase in the value during the marriage of, property determined to be separate property in accordance with subdivision (b)(2) if each party substantially contributed to its preservation and appreciation." "Substantial contribution" is defined as including "the direct or indirect contribution of a spouse as homemaker, wage earner, parent or family financial manager, together with such other factors as the court having jurisdiction thereof may determine[.]" Tenn. Code Ann. § 36-4-121(b)(1)(D).

In contrast, "separate property" is defined as:

(A)    All real and personal property owned by a spouse before marriage, including, but not limited to, assets held in individual retirement accounts (IRAs) as that term is defined in the Internal Revenue Code of 1986 (26 U.S.C.), as amended;

(B)    Property acquired in exchange for property acquired before the marriage;

(C)    Income from and appreciation of property owned by a spouse before marriage except when characterized as marital property under subdivision (b)(1);

(D)    Property acquired by a spouse at any time by gift, bequest, devise or descent;

- 16 -

(E)     Pain and suffering awards, victim of crime compensation awards, future medical expenses, and future lost wages; and

(F)     Property acquired by a spouse after an order of legal separation where the court has made a final disposition of property.

Tenn. Code Ann. § 36-4-121(b)(2).

The trial court determined the Etowah House to be Wife's separate property, finding:

> She was living there at the time of the marriage. The parties lived there for approximately two (2) months during the marriage while damage to the parties' marital home was being repaired. Husband's name has never been on the deed to this property and even though the parties borrowed money against this property, the proceeds were used by Husband in the business of PTI. Wife paid off the mortgage on this property during the parties' separation and the Court awards this to her as her separate property, with a value of $275,000.

Questions relating to the classification of assets as marital or separate are questions of fact. *Stratienko v. Stratienko*, 529 S.W.3d 389, 398-99 (Tenn. Ct. App. 2017) (citing *Bilyeu*, 196 S.W.3d at 135). Accordingly, we review such questions *de novo* with a presumption of correctness. *See* Tenn. R. App. P. 13(d).

During trial, Wife testified that she was living at the Etowah House, having moved out of the marital residence after she filed the divorce complaint. Wife stated that she had owned the Etowah House since 1983, before the parties were married, having originally purchased it with her first husband. Wife explained that the parties had rented the home to third parties during the marriage while Husband and Wife resided in the marital residence on their farm. According to Wife, the Etowah House had a mortgage balance of around $40,000.00 when the parties married. The parties refinanced the mortgage twice during the marriage such that the balance on the mortgage was around $22,000.00 when Wife moved back in after filing the divorce complaint. Wife explained that she had since paid that mortgage in full during the parties' separation.

Wife stated, and Husband did not dispute, that Husband's name had never been on the deed for the Etowah House. Wife acknowledged, however, that she and Husband had improved the Etowah House during the marriage by adding around 400 square feet of living space, adding a garage, screening in the deck, placing a "shed" over the pool, and adding sidewalks. Wife explained that when the couple had last refinanced the mortgage to obtain funds to apply toward a marital business, Husband told her that this was to "pay for" the renovations made to the Etowah House. Although Wife could not remember the source of

- 17 -

the funds used at the time of the renovations, she said they had not acquired a loan when those renovations were made.

Wife estimated that the couple had spent approximately $25,000.00 renovating the Etowah House. Wife did not provide an opinion regarding the home's value at the time of the marriage. Wife explained that the parties had lived at the Etowah House for short stints during the marriage when their marital residence was being repaired but that they had never resided in the Etowah House for any great length of time.

By contrast, Husband testified that the parties had lived at the Etowah House for approximately two years during the marriage. Husband also claimed that the parties had spent about $60,000.00 on renovations to the Etowah House, rather than $25,000.00 as Wife had stated. Although the trial court found Husband's trial testimony generally not credible, Husband's testimony mirrored Wife's regarding the fact that they had refinanced the mortgage relative to the Etowah House to obtain funds for their dairy business and that he had informed her that this would be considered "repayment" for renovations to the Etowah House.

Certain of the facts presented—that the Etowah House was undisputedly owned by Wife at the time of the parties' marriage and that Husband's name was never placed on the deed—support a finding that the home was Wife's separate property. *See* Tenn. Code Ann. § 36-4-121(b)(2)(A). However, other facts, such as undisputed evidence regarding significant renovations made by the parties during their marriage and the use of marital funds to pay the mortgage and other expenses associated with the Etowah House, support a finding that the home had been transmuted to marital property. As our Supreme Court has explained:

> [S]eparate property becomes marital property [by commingling] if inextricably mingled with marital property or with the separate property of the other spouse. If the separate property continues to be segregated or can be traced into its product, commingling does not occur. . . . [Transmutation] occurs when separate property is treated in such a way as to give evidence of an intention that it become marital property. . . . The rationale underlying these doctrines is that dealing with property in these ways creates a rebuttable presumption of a gift to the marital estate. This presumption is based also upon the provision in many marital property statutes that property acquired during the marriage is presumed to be marital. The presumption can be rebutted by evidence of circumstances or communications clearly indicating an intent that the property remain separate.

*Snodgrass v. Snodgrass*, 295 S.W.3d 240, 256 (Tenn. 2009) (quoting *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 747 (Tenn. 2002)).

- 18 -

As this Court has delineated:

> Four of the most common factors courts use to determine whether real property has been transmuted from separate property to marital property are: (1) the use of the property as a marital residence; (2) the ongoing maintenance and management of the property by both parties; (3) placing the title to the property in joint ownership; and (4) using the credit of the non-owner spouse to improve the property. Accordingly, our court has classified separately owned real property as marital property when the parties agreed that it should be owned jointly even though the title was never changed, or when the spouse owning the separate property conceded that he or she intended that the separate property would be converted to marital property.

*Hayes v. Hayes*, No. W2010-02015-COA-R3-CV, 2012 WL 4936282, at *12 (Tenn. Ct. App. Oct. 18, 2012) (quoting *Fox v. Fox*, No. M2004-02616-COA-R3-CV, 2006 WL 2535407, at *5 (Tenn. Ct. App. Sept. 1, 2006)).

Following our review of the record, we conclude that the evidence supports the trial court's decision to classify the Etowah House as Wife's separate property. The evidence demonstrated that the home was owned by Wife at the time of the parties' marriage, *see* Tenn. Code Ann. § 36-4-121(b)(2)(A), and that the title was never jointly held. Moreover, the home never served as the parties' marital residence except during brief periods when the actual marital residence was under repair. In addition, Husband did not demonstrate that his credit was utilized to improve the real property. Instead, the Etowah House was used as collateral for loans to obtain funds that were used in the parties' marital business, and Husband admitted that he had told Wife that such practice would "repay" her for the renovations the parties had made to the home. Accordingly, Husband has not demonstrated that Wife evinced a clear intent that this separate property be converted to marital property. *See Hayes*, 2012 WL 4936282, at *12.

Husband also posits, however, that the trial court erred by failing to classify the increase in the Etowah House's value as part of the marital estate because the facts demonstrated that he had substantially contributed to the home's preservation and appreciation. Upon review, we agree with Husband that the evidence supported a finding that Husband had substantially contributed to the preservation and appreciation of the Etowah House. Wife acknowledged that the parties had made significant improvements to the home during the marriage and that ongoing maintenance and mortgage payments had been paid using marital funds. As our Supreme Court has explained:

> Under our state law, equity in separate property that accrues during the marriage is subject to division as marital property if the non-owner spouse makes a substantial contribution to the increase in the value. To exclude that increase from division would be contrary to the plain meaning of the statute.

*Cohen v. Cohen*, 937 S.W.2d 823, 833 (Tenn. 1996) (internal citations omitted). The *Cohen* Court accordingly determined that a non-owner spouse was entitled to share in the increase in value of separate property during the marriage because the proof demonstrated that the non-owner had substantially contributed to an increase in the property's equity by earning an income and contributing to the joint account from which the mortgage payments were made. *See id.*

Years later, in *Denton v. Denton*, 33 S.W.3d 229, 233-34 (Tenn. Ct. App. 2000), this Court made a similar determination based on the husband's substantial contributions to the wife's separate property's appreciation, which was due to his expenditure of time and money on maintenance and renovations to the property. The *Denton* Court ruled that the husband was entitled to share in the property's appreciation in value despite the fact that a portion of the increase was also due to normal inflation. *See id.* at 235. The Court quoted at length from our Supreme Court's decision in *Ellis v. Ellis*, 748 S.W.2d 424, 426-27 (Tenn. 1988), wherein the High Court found that once a substantial contribution by a non-owner spouse was proven, that spouse was entitled to share in the full amount of the property's appreciation. The *Denton* Court noted that substantial contributions "need not be monetarily commensurate with the appreciation in the property's value during the marriage." *See* 33 S.W.3d at 236 (quoting *Mahaffey v. Mahaffey*, 775 S.W.2d 618, 623 (Tenn. Ct. App. 1989)).

In a subsequent case addressing this issue, this Court clarified:

An increase in value during the marriage of property determined to be separate property will be classified as marital property if "each party substantially contributed to its preservation and appreciation." Tenn. Code Ann. § 36-4-121(b)(1)(B); *Keyt*, 244 S.W.3d at 328-29. As the Supreme Court stated in *Keyt*, the non-owner spouse's contributions must be "real and significant," and also linked to the appreciation in value of the separate property:

[I]ncreases in the value of separate property during a marriage will not be considered marital property unless both parties "substantially contributed" to the appreciation in the value of the property. Tenn. Code Ann. § 36-4-121(b)(1)(B); *Harrison v. Harrison*, 912 S.W.2d 124, 127 (Tenn. 1995). While these contributions may be either "direct" or "indirect," Tenn. Code Ann. § 36-4-121(b)(1)(D), they must satisfy two requirements. *McFarland v. McFarland*, No. M2005-01260-COA-R3-CV, 2007 WL 2254576, at *6 (Tenn. Ct. App. Aug. 6, 2007). First, the contributions must be "real and significant." *Id.*; *Brown [v. Brown]*, 913 S.W.2d [163, 167 (Tenn. Ct. App. 1994)].

- 20 -

> "Second, there must be some link between the spouses' contributions and the appreciation in the value of the separate property." *McFarland*, 2007 WL 2254576, at *6; *Langschmidt* [*v. Langschmidt*], 81 S.W.3d [741,] 746 [(Tenn. 2002)]. Whether a spouse made a "substantial contribution" to the preservation and appreciation of separate property is a question of fact. *Sherrill v. Sherrill*, 831 S.W.2d 293, 295 (Tenn. Ct. App. 1992).

*Keyt*, 244 S.W.3d at 328-29.

*Summer v. Summer*, 296 S.W.3d 57, 62-63 (Tenn. Ct. App. 2008).

Here, the proof demonstrated that both parties had earned wages during the marriage and that these wages were placed into a joint account from which expenses and mortgage payments related to the Etowah House were paid. Moreover, the parties acknowledged that they had made significant renovations during the marriage that had increased the Etowah House's size and amenities. The evidence thus appears to support a finding of contributions by the parties that were "real and significant." *See Keyt*, 244 S.W.3d at 328-29. We must also consider, however, whether there was a link between the parties' contributions and any increase in the equity and value of the Etowah House. Although we would assume such to be the case given the substantial improvements that were undertaken by the parties during the marriage, we note that neither party provided proof regarding the amount of the Etowah House's appreciation during the marriage. Although the parties generally agreed regarding the value of the home at the time of the divorce, no evidence was introduced concerning the home's value at the time of the marriage and the extent to which that value had increased during the marriage. Accordingly, we reverse the trial court's determination that the entire value of the Etowah House was Wife's separate property, and we remand this issue to the trial court.

On remand, the trial court should determine the value of the Etowah House at the time of the parties' marriage, hearing additional evidence if necessary, and consider whether any increase in that value by the time of the divorce was attributable to the contributions made by the parties during the marriage. If so, the amount of that increase should be equitably divided as a marital asset in the trial court's overall distribution.

## VI. Valuation of PTI

Husband asserts that the trial court erred in determining that the parties' business, PTI, was worth $565,000.00. Wife, while acknowledging that both parties' experts had valued PTI at zero at trial, argues that the trial court's valuation was correct because of Husband's "poor business management and his violations of statutory injunctions concerning incurring additional debt."

The trial court made the following extensive factual findings concerning PTI:

The most contentious area of disagreement between the parties concerns the business, [PTI], and its operation and valuation. PTI was created during the marriage and both parties worked there during the marriage. This company was created to represent machine and tool builders throughout the world. It is PTI's job to match the machine and tool builders with projects or create projects for the builders and sell machines to buyers. At PTI, Wife set up QuickBooks and hired a CPA. She was in and out of the office and did the communications for the corporation. She oversaw the employees and performed interviews. She was the secretary of the corporation. Husband is the person who put buyers and sellers together. He admits it may take years after the commission is earned for a sale to be completed and a commission paid. This company currently has two commissions earned and outstanding. Husband admits PTI is to be paid a commission of 3% for the sale of a $5,500,000 machine that has been delivered. In addition, Husband is owed commission on a machine in Spain.

PTI is a corporation begun by the parties during the marriage. It is marital property. The parties each hired an expert concerning the business valuation. Wife's business evaluator, Mr. Vance's, report is Exhibit 7 and initially valued this business at $202,000. Husband's appraiser, Ms. Harwell, valued the business at (-$324,000) and [her report] is Exhibit 10. These numbers changed over the course of discovery and trial and eventually the parties agreed it has a zero value, as of the date of the hearing, because of the debt associated with it, much of which was incurred by Husband during the pendency of the divorce and his other activities which decreased its value. Husband admits according to Exhibit 1, Page 24, Line 14 that a debt was created at River Valley Agriculture Credit for purposes of paying for a machine purchased from Takisawa Corporation. He intended to pay back the loan from his own lawsuit against Coyote; however, the statute of limitations ran before he filed the lawsuit. He admits he did not use the $69,000 loan to pay for the machine and has no proof of where this money went. The Court finds this is improper money management, possibly creating a fraud on River Valley Agriculture Credit and/or Husband is hiding the money for use after the divorce. The loan and loss of claim devalues PTI as a marital asset. This factors into the Court's finding as to its value below.

Like many small businesses, the owners of PTI and especially Husband, did not closely observe the corporate form. Many things noted by the experts indicated that shareholder loans paid for the couple's lifestyle until the time of the filing of the divorce. After the parties filed for divorce,

Husband maintained complete control of this asset and utilized it for his own benefit. Husband continued to take money out of the company and increased shareholder loans and took out other loans for over $400,000. He has continued to utilize its income for his personal benefit and failed to properly and credibly account for its income and loan proceeds.

According to Husband's expert, shareholder loans were used for farm expenses, rental real estate expenses, property taxes, income taxes, insurance payments, personal legal expenses, payments for an assistant, loan payments, utilities, medical expenses, meals, IRS payments, and day-to-day living expenses. Husband, through his corporation, applied for and received an SBA-EIDL loan for $433,380 during the pendency of the case in violation of the statutory injunction. He has failed to account for those funds. According to Husband's expert, part of those funds was used to reduce accounts payable to $14,169 as of October 31, 2022. This left $113,800 unaccounted for. According to Harwell, this business is not a viable operation if operating results continue as they have since 2018. It is unknown if or how many sales generated during the marriage, will be completed after the divorce, or if Husband is hiding those commissions.

Mr. Vance, performed a financial analysis determining the overall financial health of the company and its ability to generate cash flow. According to Vance, it appears that in 2022, Husband took $180,415 out of this company. He also increased the debt of this company. The net current assets, according to Husband's own expert, have decreased from $131,966 to $18,073. The net working capital decreased from $69,820 to (-$234,055) until the SBA loan was obtained. During this divorce, it is noted that the contract labor of PTI has increased from $53,137 to $179,112. Sales expense has increased from $15,241 to $45,985. Husband takes money for rent for office space from the company, as well as having the company pay personal expenses. Neither expert addressed commission receivables that appear to be delayed. These receipts were earned during the marriage. They would increase the value of the company and Wife is entitled to a share.

As Mr. Vance testified, the primary method of getting income out of a corporation is through W-2 wages. Other ways to take money include taking distributions and calling it a "stockholder or shareholder loan." Mr. Vance testified the IRS frowns upon stockholder loans and for this reason such loans need to be set up as a receivable on the books of the corporation, have loan documents supporting them, and treat them as taxable income to the person receiving the money.

- 23 -

By his own admission, Husband has used stockholder loans as a mechanism to get money out of the company to avoid taxes. Some promissory notes were executed after the distribution had taken place. In fact, Husband eventually admitted back-dating several promissory notes after first denying this practice. When confronted with Exhibits 16 and 17, Husband was surprised [Wife] had these and testified no one was supposed to have them. He had told staff to leave them in his office. Husband testified someone broke into his office and stole Exhibit 17. Upon further questioning he admitted Mr. Fuller, his previous attorney, may have provided the documents to Wife's counsel. This is but one of many examples of Husband's ever-changing testimony, and attempts to hide things, that leaves him with little credibility. These stockholder loans directly affect the value of the company. Additionally, Husband moved PTI money around to different accounts at different banks and in different states. He opened and closed accounts during the pendency of this divorce, attempting to hide assets. This increased costs to Wife to find assets that were not disclosed. Mr. Vance testified that if the shareholder loan were collectible from Husband and using the asset approach, it would increase the value of this company some $660,000. According to Mr. Vance, you could increase the value of this company by adding back the SBA loan in the amount of $433,000. If both were done, it would add $1,000,000 to the value of PTI. Husband has no intention of repaying the $600,000 he has taken from the company. Also, during the pendency of the divorce, there was a judgment against PTI for $145,000. This did not appear to be reflected in the books of PTI.

According to Mr. Vance internal financial statements do not fully agree with the tax returns. The general ledgers contain several entries that were reversed after the tax return was filed. In Mr. Vance's opinion, this business is not worth less than zero because it is a going concern and Husband is regularly taking money out of the company and the company holds assets which could be sold. Based upon the reasoning by the experts and their reports, the Court finds this company had a value of $400,000 before Husband's actions dissipated it in an effort to deprive Wife of her lawful share. The Court finds Husband caused its value to decline during the pendency of the divorce. He has cross-collateralized his and Wife's real property with PTI. Husband increased the debt of this corporation during the pendency of this divorce and if this were reversed, the business would have marital value.

Husband has been reckless in the management of PTI and his personal affairs. This is evident in two transactions where he failed to utilize a loan to pay for Takisawa equipment. Instead, the money is unaccounted for. He

allowed his claim to be lost in a lawsuit, because of the running of a statute of limitations and failed to defend a second lawsuit against PTI[.] Husband provided no proof of a judgment being paid even though the debt was set up on payments.

* * *

Husband's actions result in him having little credibility with this Court. He was angry with a bookkeeper who tried to comply with the Court order to give Wife access [to accounts]. Husband admitted he placed the money he received from the SBA loan in Alabama, as well as other monies, so that he could "protect" the money.

* * *

[T]he Court finds that PTI, at the time of the divorce hearing, has a zero value. However, the Court also finds that part of the reason it has a zero value is because Husband borrowed some $400,000 on an SBA loan in violation of the statutory injunction, he increased shareholder loans during the pendency of the divorce in excess of $400,000 and failed to list his accounts receivable which are his unpaid commissions. Therefore, the Court finds the value of the company to be $400,000 or more.

* * *

The Court also finds Husband is scheduled to receive $165,000 in commissions that he is delaying at this point in time. The sale has taken place. The Court finds this is PTI property, and will increase the value of PTI by $165,000. It was not included in the company appraisals.

Accordingly, the trial court valued PTI at $565,000.00 and awarded it to Husband in the division of marital assets.

We reiterate that a trial court's valuation of a marital asset is a question of fact, for which the parties bear the burden of presenting competent evidence. *Kinard*, 986 S.W.2d at 231. To determine value, the trial court must consider "all relevant evidence," and if the evidence of value is conflicting, "the trial judge may assign a value that is within the range of values supported by the evidence." *See id.* This Court should presume that the trial court's factual determination regarding value is correct unless the evidence preponderates against it. *See id.*

The trial court herein heard evidence concerning the value of PTI from two experts: Wife's expert, Robert Vance, and Husband's expert, Renee Harwell. Mr. Vance initially

valued PTI at $202,000.00, after considering all three approaches applicable to a closely held corporation: asset, income, and market. However, Mr. Vance testified that he had since reduced the value to zero after discovering that an assumption he had made regarding certain equipment was incorrect. Mr. Vance further testified that although PTI did maintain assets, the corporation also owed $751,000.00 in debt to third parties. According to Mr. Vance, $427,000.00 of that debt was for an Economic Injury Disaster Loan (related to the COVID-19 pandemic) from the Small Business Administration ("SBA EIDL loan"), which Husband had procured in 2022 during the pendency of the divorce proceedings.

Mr. Vance reported that PTI was an "S" corporation such that Husband was an employee of the corporation and should receive any income via a W-2 or dividend. However, Mr. Vance stated that owners could also receive money from a corporation and categorize the disbursements as a "shareholder loan," which was recorded as an account receivable for the corporation and would not "show up" as income to the owner. Mr. Vance explained that by engaging in this practice, Husband could potentially reduce his tax liability by putting money "in his pocket" without having to pay tax on income or capital gains. According to Mr. Vance, PTI's books showed a shareholder loan for Husband of more than $600,000.00. Mr. Vance treated this loan as uncollectable because he did not believe that Husband would pay it back, but he stated that if it were collectable, it would increase the value of PTI by $662,000.00.

Mr. Vance disagreed with Ms. Harwell's valuation of PTI because it was a negative number. Mr. Vance explained that he did not believe a corporation could have a negative value because the shareholders' stock always had value. Mr. Vance acknowledged that adding back the value of the shareholder loan to Ms. Harwell's valuation number would cause PTI to have a positive value.

Ms. Harwell had initially assigned a negative value to PTI of -$324,000.00. However, after learning of a recent judgment against PTI, she reduced the value further to -$470,000.00. Ms. Harwell explained that in her opinion, shareholder loans were not income to the owner, even if they were used to pay personal expenses. She admitted, however, that this practice could decrease the corporation's value.

Rob Love, who had served as PTI's bookkeeper from March 2019 to February 2020, testified that when corporate checks had been cut that did not pertain to a specific bill, Husband had instructed that those expenditures should be categorized as shareholder loans. Mr. Love stated that this practice included checks made out to Husband or for cash withdrawals. However, Mr. Love explained that this practice of categorizing certain expenses as shareholder loans predated Mr. Love's employment with PTI. Mr. Love testified that the amount of the outstanding shareholder loan was reduced significantly at the end of 2017 or 2018 by Husband's accountant, but Mr. Love did not know the reason for this reduction.

Wife testified that when the parties first formed PTI, she had set up their chart of accounts in QuickBooks and that there had been no account for shareholder loans. Wife posited that Husband's practice of taking money from the corporation or paying personal expenses and categorizing those transactions as shareholder loans began in 2008 or 2009 after they had incurred a large income tax liability for the previous year. Wife testified that Husband did not like to pay taxes, so he began to pay more expenses through the business. Wife testified that Husband would "use" the shareholder loans for whatever he desired, even if he simply took cash out of the corporation and put it in his safe. Wife reported that the balance of the shareholder loan was $264,000.00 in December 2018 and that the balance had increased as follows: $322,000.00 in 2019; $418,000.00 in 2020; $425,000.00 in 2021; $503,000.00 in 2022; and $662,000.00 by the time of the divorce trial.

Wife stated that Husband had produced documents in discovery demonstrating that in 2019, the balance of the shareholder loan was $1,276,000.00. However, she stated that Husband's attorneys had removed $626,000.00 from the loan balance, which they considered to be living expenses for the parties, and had drafted a promissory note for the remaining $650,000.00. Wife denied having any knowledge of this action at the time. Although Wife acknowledged that she may have benefitted from funds from the shareholder loans while the couple were together, she stated that she did not know the extent of any such benefit because Husband had denied her full access to the financial records. According to Wife, Husband did not obtain her consent before taking out the $433,000.00 SBA EIDL loan in 2022 during their separation, which loan had decreased PTI's value.

Husband testified that his salary from PTI, as shown on his W-2, was approximately $15,000.00 per year. Husband stated that all other money at the parties' disposal came from shareholder loans from PTI. Husband claimed that most of the "loan" monies went into the couple's joint account and the rest was used to invest in their rental properties. Husband admitted that he had signed a promissory note to PTI for $650,000.00 in 2018 and that the note had not been notarized until 2020. He further admitted that another promissory note had been signed using his "stamp" signature eight days prior in the amount of $500,000.00. Husband claimed that his attorneys had removed $626,000.00 from the balance of the shareholder loan, which had been previously greater than $1,200,000.00.

Regarding the SBA EIDL loan, Husband explained that PTI was in "bad shape" after the pandemic and that he needed the loan to keep PTI afloat. Husband also testified that he used the SBA EIDL loan proceeds to purchase some equipment for customers in addition to paying salespersons, corporate debts, and attorney's fees. Husband admitted that the SBA EIDL loan proceeds had been initially deposited into an Alabama bank account that he had opened in 2022 and that, at one point, this bank account had had over $440,000.00 in it. Husband stated that by the time of trial, the Alabama bank account only contained about $1,000.00. Husband acknowledged that PTI was due to receive a

commission on an equipment sale but claimed that most of those proceeds would go toward expenses and commissions paid to salespersons.

Husband now argues that the trial court erred in valuing PTI at $565,000.00 based on this uncollected commission, as well as the significant "shareholder loans" that Husband had taken from PTI and the SBA EIDL loan that Husband obtained during the parties' separation. The trial court found that because Husband had maintained complete control of PTI during the parties' separation and had made poor management choices that devalued PTI as a marital asset, certain of those choices should not be counted as a decrease in PTI's value. In other words, the court found that Husband had dissipated this marital asset.

Typically, division of a marital estate must begin with the trial court classifying the parties' property as separate or marital. *Luplow v. Luplow*, 450 S.W.3d 105, 109 (Tenn. Ct. App. 2014). Once a trial court classifies property as marital, it must place a reasonable value thereon. *See id.* After the marital property has been valued, the trial court should proceed to equitably divide the marital estate in accordance with the factors listed in Tennessee Code Annotated § 36-4-121(c). *See id.* at 110. One such factor requires the court to consider, with respect to an equitable distribution, the "contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation" of the property. *See* Tenn. Code Ann. § 36-4-121(c)(5)(A). The statute defines dissipation of assets as "wasteful expenditures which reduce the marital property available for equitable distributions and which are made for a purpose contrary to the marriage either before or after a complaint for divorce" has been filed. *See* Tenn. Code Ann. § 36-4-121(c)(5)(B).

Here, the trial court's approach with respect to PTI's value did not precisely follow the above-described framework in that the court considered Husband's dissipation of PTI as a marital asset when assigning its value rather than waiting until the court fashioned an equitable distribution of all of the marital assets. However, such approach is similar to the method utilized by the trial court in *Kholghi v. Aliabadi*, No. M2019-01793-COA-R3-CV, 2020 WL 5607816, *15-20 (Tenn. Ct. App. July 7 2020), wherein the trial court was tasked with valuing the husband's interest in a closely held corporation he owned with his father. The *Kholghi* trial court valued the marital portion of the husband's interest in the corporation, which the husband claimed to be of zero or negative value, at $820,000.00. *See id.* In doing so, the trial court considered that the husband had increased the amount of shareholder loans he owed to the corporation during the pendency of the divorce proceedings and analyzed whether the value of the corporation should be offset by the full amount of such loans. *See id.* As this Court explained in *Kholghi*:

> Husband and his father had historically taken what they designated as "shareholder loans" from MSM [the corporation] over and above their traditional salaries. They used the company credit cards for both personal and business expenses, and MSM paid the monthly credit card bills. Husband would tell the company's accountant which expenses he deemed

"personal" or "business," and the personal expenses would be recorded as a "loan" to Husband. There was no loan document, no collateral, and no interest owed or paid. Husband would void his monthly paycheck, and that amount would be credited as a payment toward his loan balance. In August 2016, before the complaint for divorce was filed on September 8, Husband owed $592,285.96 in shareholder loans. However, his loan balance tripled during the divorce proceeding. In addition to his traditional compensation, Husband charged $614,985.70 in shareholder loans in 2016; $449,420.17 in shareholder loans in 2017; and around $383,000 in 2018. His loan balance was at an all-time high of $1,781,624.46 by November 2018, shortly before trial. His father's loan balance was only $128,119.27. Some of Husband's credit card charges benefitted Wife, such as payment of the mortgage for the marital home and the parties' attorneys' fees. However, many of the other charges did not benefit Wife, such as Husband's apartment rent and related bills, part of the payment for his Porsche, and living expenses for his grown children.

The trial court valued the marital portion of Husband's one-half interest in MSM at $2,170,000. The court noted Husband's argument that his entire shareholder loan balance of $1,781,624 should be offset against that value when valuing the parties' marital asset. The trial court noted that if it did so, the value of Husband's marital interest in MSM would only be $388,376. The trial court ultimately declined to offset the entire balance of the shareholder loan, finding that a portion of the loan represented "dissipation of the parties' marital assets" by Husband. Specifically, the trial court only offset $1,350,000 of shareholder loans against the value of the business as "legitimate marital expenses," holding that the remaining $431,624 in shareholder loans constituted dissipation by Husband. By our calculation, the trial court deemed 75% of the shareholder loans as legitimate and 25% as dissipation. This resulted in the trial court reducing its valuation of the parties' marital share of MSM from $2,170,000 to $820,000 because of the shareholder loans.

The trial court gave a lengthy explanation for its decision to classify a portion of the shareholder loans as dissipation. Simply put, the trial court found that "during the pendency of this divorce, the Husband has dissipated the marital estate by his extravagant spending." The court found that Wife did not have control over Husband's borrowing from the company or any input into how the shareholder loans were spent. It found that some expenditures did not benefit her and in fact "were detrimental to her by reducing the value of her equitable interest in the parties' share of the business."

*Id.* at *16.

On appeal in *Kholghi*, this Court noted that its "analysis of this issue is somewhat complicated by the fact that this case does not involve a mere wasteful expenditure of a singular marital asset"; rather, "the trial court's finding of dissipation was 'imbedded' within its business valuation of" the corporation. *Id.* at *15. Recognizing that the husband's having caused a significant increase to the balance of his shareholder loan "had the effect of reducing the value of a sizeable marital asset," this Court further recognized that the trial court's determination of the corporation's value involved not only the valuation of a marital asset, but also the related issues of debt and dissipation. *Id.* The *Kholghi* Court proceeded to explain:

> No matter how we precisely characterize the issue, the trial court's decision on such matters is entitled to deference on appeal. Appellate courts "give great weight to the trial court's division of marital property and 'are disinclined to disturb the trial court's decision unless the distribution lacks proper evidentiary support or results in some error of law or misapplication of statutory requirements and procedures.'" *Larsen-Ball* [*v. Ball*], 301 S.W.3d [228,] 234 [(Tenn. 2010)] (quoting *Keyt v. Keyt*, 244 S.W.3d 321, 327 (Tenn. 2007)).

Reviewing the facts presented, the *Kholghi* Court concluded that the evidence supported the trial court's valuation of the husband's interest in the corporation and disregarded a portion of the shareholder loans, finding such disregarded portion to be dissipation that served to reduce the value of the marital asset. *Id.* at *20.

The trial court herein similarly considered Husband's dissipation of the value of PTI by incurring additional business debts during the parties' separation without Wife's knowledge or consent as well as his significant increase in the use of shareholder loans as a mechanism to take funds from the company without having to report those funds as income. The evidence supports these findings. Mr. Vance testified that he had treated the shareholder loan as uncollectable because he did not believe that Husband would pay it back, but he stated that if it were collectable, it would increase the value of PTI by $662,000.00. Moreover, Husband never fully accounted for the funds received from the SBA EIDL loan in the amount of $433,000.00. He acknowledged that he had deposited those funds in a bank account in Alabama for a period of time without Wife's knowledge. Although Husband provided a vague list of purported expenditures from those funds, the trial court found his testimony lacking in credibility. For these reasons, we conclude that the trial court's initial finding that PTI had a value of $400,000.00 is supported by the evidence.

With regard to the trial court's addition of $165,000.00 to the value of PTI for an unpaid, "earned" sales commission, however, the evidence is not as clear. The trial court

found: "Husband is scheduled to receive $165,000 in commissions that he is delaying at this point in time" and added that amount to PTI's value, for a total value of $565,000.00. Respecting this issue, Husband's testimony during trial was that PTI had procured an order for a "new telescope that's going into Argentina." Husband explained that although this telescope was scheduled to have gone into production in 2020, production had not yet begun by the time of trial in 2023. Husband stated that the contract price was $5,500,000.00 and that PTI would receive a three-percent commission, which equates to $165,000.00.

Inexplicably, Husband also later stated that the machine had been delivered to the buyer but that there were issues with it such that PTI had only received a small advance on its commission payment. Husband further testified that PTI had made a downpayment on a machine that would soon be delivered to a government facility in Oklahoma City, for which PTI would receive $300,000.00 in commission. Husband stated, however, that PTI would only net $4,000.00 from that commission after the salesperson and other expenses and loans were paid.

Regarding the potential $165,000.00 commission payment, when Husband was asked whether PTI had received it, he responded: "We have got a small portion that I begged for, and now the rest of it, we're going to wait and see." Husband clarified that there was a "major control problem" with the machine and that the company who had ordered it had lost over $1,000,000.00, which "jeopardizes [PTI's] money." No other evidence was presented regarding this potential commission.

Based on the evidence presented, we simply cannot conclude that the addition of $165,000.00 to the value of PTI for a somewhat speculative commission was supported by the proof in the record. Even taking the trial court's findings regarding Husband's lack of credibility into account, the evidence was undisputed regarding the fact that this commission was unrealized at the time of trial. In addition, as Husband explained regarding the commission for the Oklahoma City contract, PTI would likely not realize the entire amount of the commission were it collectable because there would be expenses that would need to be paid from it. Therefore, we reverse the portion of the trial court's judgment adding this $165,000.00 commission amount to PTI's value and remand that issue to the trial court for further hearing and determination as necessary. We affirm the remainder of the trial court's findings regarding PTI's value.

VII. Distribution of the Marital Estate

Finally, Husband asserts that the trial court's division of the parties' marital estate was inequitable. However, due to the unresolved valuation issues regarding PTI and the Etowah House, we have no choice but to vacate the trial court's overall distribution of marital property. *See Hill v. Hill*, No. M2011-02253-COA-R3-CV, 2012 WL 4762110, at *3 (Tenn. Ct. App. Oct. 5, 2012) (noting that "this court cannot evaluate the equity of the

- 31 -

trial court's division of the marital assets (and debts) without a valuation and division" of all of the parties' assets); *see, e.g.*, *Anderton v. Anderton*, 988 S.W.2d 675, 679 (Tenn. Ct. App. 1998) ("The dissolution of a marriage requires the courts to engage in the orderly disentanglement of the parties' personal and financial affairs. Many of the issues that must be addressed during this process are interrelated, and the disposition of earlier issues directly influence the decision on later issues."). We therefore vacate the trial court's distribution of marital property and debts and remand for further proceedings in light of this Opinion. However, upon remand, all issues concerning the classification and valuation of other assets will remain unaffected because they were not raised on appeal. *See Brunetz v. Brunetz*, 573 S.W.3d 173, 186 (Tenn. Ct. App. 2018) (stating that issues not raised in a party's statement of issues "are deemed waived").

## VIII. Conclusion

For the foregoing reasons, we reverse the trial court's determination that the entire value of the Etowah House was Wife's separate property, and we remand that issue to the trial court for a determination of whether the value of that asset increased during the marriage due to the parties' substantial contributions. If the trial court finds this to be true, the amount of any such increase should be equitably divided as a marital asset in the trial court's overall distribution. We also reverse the trial court's valuation of PTI and remand for further determination regarding the trial court's addition of an unrealized $165,000.00 commission. Based on these rulings, we vacate the trial court's overall distribution of marital assets and debts and remand that issue for further determination in light of this Opinion. Costs on appeal are assessed one-half to Wife, Mary Sue Gaston Lee, and one-half to Husband, Danny C. Lee.

s/Thomas R. Frierson, II

_____
THOMAS R. FRIERSON, II, JUDGE